## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MANIILAQ ASSOCIATION,       )
                          )
           **Plaintiff**,        )    **Civ. Action No. 13-cv-380 (TFH)**
      **v.**                    )
                          )
                          )
**SYLVIA BURWELL, Secretary of the**   )
**Department of Health and Human Services,** )
**et al.,**                     )
                          )
          **Defendant.**       )
_____)

## AMENDED MEMORANDUM OPINION[1]

Plaintiff Maniilaq Association ("Maniilaq" or "plaintiff") administers healthcare systems through a self-determination compact and annual funding agreements under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 458aaa, *et seq.* The plaintiff is seeking a declaration that a lease with the Indian Health Service ("IHS" or "defendant") for one of the clinics Maniilaq operates under its self-determination compact is incorporated into Maniilaq's 2013 funding agreement as a matter of law. Pending before the Court are the parties' cross motions for summary judgment.[2] For the reasons stated below, the Court **GRANTS** Plaintiff's Motion for

---

[1] This Memorandum Opinion was amended on November 3, 2014 to correct typographical and citation errors. The Order issued by the Court on August 22, 2014 [ECF No. 31] stands.

[2] *See* Plaintiff's Motion for Summary Judgment [ECF No. 17]; Defendant's Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 21]; Plaintiff's Opposition to Defendant's Motion to Dismiss and Cross Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 27] ("Pl.'s Reply"); Defendant's Reply in Support of Cross Motion for Summary Judgment [ECF No. 29] ("Def.'s Reply").

Summary Judgment and **DENIES** Defendant's Cross Motion for Summary Judgment. An appropriate Order accompanies this opinion.

## I.     FACTS

The facts of this case are substantially undisputed. The controversy between the parties depends on the legal consequences of a letter and proposed lease agreement Maniilaq sent to the IHS concerning a clinic Maniilaq operates in the Village of Ambler, Alaska ("Ambler Clinic").

IHS is the agency within the Department of Health and Human Services ("HHS") responsible for providing federal health services to American Indians and Alaska Natives. Def.'s Mem. in Supp. of Mot. to Dismiss or, in the Alternative for Summ. J. 3 [ECF No. 21] ("Def.'s Mem.). A critical component of those services is the Community Health Aide Program ("CHAP"), which requires IHS to train community health aides to provide healthcare to individuals in remote areas of rural Alaska. *See* 25 U.S.C. § 1616*l*. To facilitate CHAP, IHS leases Village Built Clinics ("VBCs") from Alaska villages in order to provide a suitable location to deliver services. Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. 4 [ECF No. 17] ("Pl.'s Mem. of P. & A.").

Maniilaq is an Alaska Native Regional Non-Profit Corporation that operates a comprehensive health services delivery program for its twelve member Alaska Native village tribes, and other eligible American Indians and Alaska Natives, in the Northwest Arctic Borough. *Id.* at 10. Pursuant to the ISDEAA, the Indian Health Care Improvement Act, and its self-determination compact with IHS, Maniilaq takes responsibility for delivering CHAP and other health care related programs, functions, services, and activities ("PFSAs") which IHS would otherwise be required to provide. *Id.* at 1; *see* 25 U.S.C. § 450f(a)(1). The self-determination compact between IHS and Maniilaq is

implemented through yearly funding agreements ("FAs"). Def.'s Statement of Material Facts ¶ 2 [ECF No. 21]. These agreements cover a variety of programs and specify both parties' obligations with respect to each program. *See generally* Pl.'s Mem. of P. & A. Ex. G, FY 2009 FA between Maniilaq Assoc. and HHS [ECF No. 17-9]. In the 2009 fiscal year, Maniilaq received a total of $35,352,362 from IHS under its FA. *Id.* at 11.

From October 1985 until January 2003, IHS leased the Ambler Clinic from the village of Ambler, Alaska. Def.'s Mem. Ex. 1, Poncho Decl. ¶¶ 6-7 [ECF No. 21-1]. In January of 2003, Maniilaq asked IHS to cancel the VBC lease with the City of Ambler because Maniilaq was taking ownership of the clinic. *Id.* at ¶ 8. At the time Maniilaq took ownership of the clinic, the lease required IHS to pay the City of Ambler $28,932.16 for the Ambler Clinic and specified that the City of Ambler was responsible for the clinic's maintenance and utilities. *Id.* at ¶¶ 7-8. At Maniilaq's request, the remaining unspent lease funds for the Ambler Clinic were left in Maniilaq's 2003 FA. *Id.* at ¶ 8. In addition to providing upkeep and maintenance, Maniilaq is required to provide a wide array of patient care services and programs at the Ambler Clinic. *See generally* Pl.'s Mem. of P. & A. Ex. G 2-9 [ECF No. 17-9]. Funding for the Ambler Clinic remained part of each of Maniilaq's FAs until 2012, but the amount that Maniilaq received associated with that clinic has not increased beyond approximately $30,000 per year that IHS had been paying the City of Ambler under the VBC lease. Poncho Decl. ¶¶ 19-20 [ECF No. 21-1]; Pl.'s Reply 2. According to Maniilaq, this amount is insufficient to keep up with rising operational costs, and "Alaska Tribal Health Programs that compact with the IHS . . . have therefore been forced to supplement federal CHAP funding with millions of dollars annually." Pl.'s Mem. of P. & A. 4.

To address this perceived funding shortfall, in February of 2012, Maniilaq informed IHS that it was electing to retrocede the Ambler Clinic back to IHS, Pl.'s Mem. of P. & A. 11, and requested that IHS enter into a new lease under the mandatory leasing provisions of 25 U.S.C. § 450j(*l*)(1), *see id.* at Ex. C, Feb. 29, 2012 Memorandum to IHS from Maniilaq Assoc. [ECF No. 17-5]. Section 450j(*l*) requires IHS to lease tribally-owned facilities "used by the Indian tribe or tribal organization for the administration and delivery of [healthcare] services" upon request of a tribal organization. 25 U.S.C. § 450j(*l*)(1). Maniilaq would continue to operate the clinic, with proceeds from the lease funding the PFSAs in Maniilaq's FA. *See* Pl.'s Mem. of P. & A. Ex. C [ECF No. 17-5].

In a May 2012 letter, IHS responded and agreed § 450j(*l*)(1) required it to enter into the lease. Pl.'s Mem. of P. & A. Ex. D, May 15, 2012 Letter to President/CEO of Maniilaq from Director of Tribal Programs, AANHS 2 [ECF No 17-6]. However, citing a lack of appropriated funds, IHS informed Maniilaq that it would pay only "non-monetary" compensation. *Id.* IHS also informed Maniilaq that it believed that "leases are not attached to funding agreements by reference or otherwise." *Id.* at 3. IHS took the position that in order to enter into the lease, Maniilaq would have to submit to the IHS's Lease Priority System ("LPS"). *Id.* at 2. IHS and Maniilaq continued to discuss the Ambler lease but could not come to an agreement.

On November 28, 2012, Maniilaq sent IHS a letter describing the parties' negotiations and proposing that IHS enter into a § 450j(*l*)(1) lease for the Ambler Clinic. Pl.'s Mem. of P. & A. Ex. E, Nov. 28, 2012 Letter to Area Director, AANHS, from President/CEO of Maniilaq Assoc. 4 [ECF No. 17-7] ("November 28 letter"). The letter was four pages long and attached a copy of the proposed lease. *See id.* In the final paragraph of the third page, Maniilaq wrote: "Enclosed please

- 4 -

find a proposed lease for the Ambler Clinic, submitted in accordance with the final offer provisions of Section 507 of the ISDEAA, 25 U.S.C. § 458aaa-6." *Id.* at 3. Maniilaq proposed a lease totaling $172,536 per year with $66,086 based on "Depreciation," and $106,450 for "Operation and maintenance." *Id.* at 4.[3] The lease would be incorporated into Maniilaq's 2013 FA, and would be renewable at the option of either party. *See id.* at 5-6.

Fifty-eight days after Maniilaq sent the November 28 letter, IHS responded and took the position that it "does not agree that the lease proposal in your offer may be submitted as a final offer under" 25 U.S.C. § 458aaa-6. Pl.'s Mem. of P. & A. Ex. F, Jan. 25, 2013 Letter to President/CEO of Maniilaq Assoc. from Director Area Director, AANHS 1 [ECF No. 17-8]. IHS reiterated its position that a § 450j(*l*)(1) lease could not be included in a FA and that Maniilaq had to submit to the LPS. *See id.*[4]

Plaintiff filed suit on March 25, 2013. *See* Compl. [ECF No. 1]. In its motion for summary judgment, Maniilaq asks the Court to declare that the lease attached to its November 28 letter is incorporated into its FA as a matter of law. The defendant cross-moved for summary judgment,

---

[3] The regulations implementing § 450j(*l*)(1) explain the possible options for compensation for a § 450j(*l*)(1) lease, which include rent, depreciation, operation and maintenance, alterations needed to make contractual requirements, and "other reasonable expenses." *See* 25 C.F.R. §§ 900.70, 900.74.

[4] Maniilaq takes the position that under 25 U.S.C. § 458aaa-16(e), IHS cannot require a tribe to submit a proposal through the LPS because the LPS is governed by the agency's Technical Handbook, and is not a regulation promulgated through IHS's rulemaking authority. *See* Def.'s Mem. 34-40; Pl.'s Reply 30-39. Because this Court finds that the lease is incorporated into Maniilaq's funding agreement due to IHS's failure to respond during the statutory period, it need not decide whether IHS could have otherwise compelled Maniilaq to seek a § 450j(*l*)(1) lease through the LPS. The Court also need not address the parties' arguments regarding whether the mandatory leasing provisions under 25 U.S.C. § 450j(*l*) give IHS discretion to determine compensation, including "non-monetary" compensation. *See* Pl.'s Mem. of P. & A. 23-26; Def.'s Mem. 30-34.

arguing that Maniilaq did not follow the proper procedures for submitting a final offer, and even if it had, a § 450j(*l*)(1) lease may not be included in a FA.

## II.    LEGAL STANDARDS

### A. Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 25 U.S.C. § 450m–1(a), which states that "[t]he United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under [the ISDEAA] and . . . over any civil action or claim against the Secretary for money damages arising under contracts authorized by [the ISDEAA]." The ISDEAA does not require plaintiffs to file an administrative appeal before bringing suit in district court. *See* 25 U.S.C. § 458aaa-6(c)(1)(C) (stating that "in lieu of filing" an administrative appeal, a tribe may "directly proceed to initiate an action in a Federal district court").

### B. Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id*. at 324. There is a genuine issue of a

material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S at 247. To determine which facts are material, a court must look to the substantive law on which each claim rests. *Id*. at 248.

When both parties cross-move for summary judgment, "neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Vaughan v. Amtrak*, 892 F. Supp. 2d 84, 91 (D.D.C. 2012) (quoting *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989)). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010) (citing *Anderson*, 477 U.S. at 247).

### C. Statutory Interpretation and Indian Law

When interpreting a statute, courts "must first determine whether the statutory text is plain and unambiguous." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (citations omitted). If a court is interpreting a law relating to the welfare of Indian nations and finds a provision is ambiguous, courts are instructed to construe statutes "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit" due to the "unique trust relationship between the United States and the Indians." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444-45 (D.C. Cir. 1988) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)). The D.C. Circuit has found that the canon of construction in favor of Indian tribes can trump the deference to agencies' interpretations courts ordinarily give under *Chevron* and its progeny:

> While ordinarily we defer to an agency's interpretations of ambiguous statutes entrusted to it for administration, *Chevron* deference is not applicable in this case. The

governing canon of construction requires that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."

*Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Blackfeet*, 471 U.S. at 166); *see also Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 59 (D.C. Cir. 1991) (declining to defer to the agency's interpretation of the governing statute "[b]ased on the special strength of this canon"); *California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008).

In enacting the ISDEAA, Congress explicitly codified the rule of construction in favor of Indian tribes. The ISDEAA states that "[e]ach provision of [the ISDEAA] and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 458aaa-11(f). Congress also instructed the agency to interpret the provisions of the ISDEAA to be inclusive:

> Except as otherwise provided by law, the Secretary shall interpret all Federal laws . . . in a manner that will facilitate-(1) the inclusion of programs, services, functions, and activities (or portions thereof) and funds associated therewith, in the agreements entered into under this section; (2) the implementation of compacts and funding agreements entered into under this part; and (3) the achievement of tribal health goals and objectives.

25 U.S.C. § 458aaa-11(a). These provisions show that Congress intended the ISDEAA to be implemented in a manner favoring flexibility in funding agreements like the one at issue in this case.

### 1. Applicable Standard of Review

The parties disagree about what standard of review is appropriate under the ISDEAA. Maniilaq asserts that that despite the usual presumption of the Administrative Procedure Act's "arbitrary and capricious" standard, the statute's text and legislative history demonstrate that *de novo* review should apply to claims under ISDEAA. Pl.'s Mem. of P. & A. 14-16; Pl.'s Reply 3-7.

- 8 -

Maniilaq suggests this Court should follow the reasoning in *Shoshone–Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306 (D. Or. 1997), a case in which the court accepted the tribe's argument that the APA standard was inappropriate because:

> (1) the use of the phrase "civil action" in § 450m–1(a) contemplates a trial *de novo;* (2) § 450m–1(a) refers to "original jurisdiction" and not "review" or "appeal;" (3) it is anomalous to obtain full discovery for an ISDEA administrative appeal under 25 U.S.C. § 450f(b)(3), but not in a district court proceeding; (4) the APA bans monetary damages which the ISDEA expressly allows a district court to award; and (5) the legislative history of the ISDEA supports a civil trial, rather than review under the APA.

Pl.'s Reply 4 (quoting *Shoshone–Bannock*, 988 F. Supp. at 1313). *See also Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1066–67 (D.S.D. 2007) (*de novo* review appropriate under the ISDEAA); *Cherokee Nation of Okla. v. United States*, 190 F. Supp. 2d 1248, 1258 (E.D. Okla. 2001), *rev'd on other grounds by Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005) (*de novo* review appropriate under the ISDEAA).

Citing *Citizen Potawatomi Nation v. Salazar*, 624 F. Supp. 2d 103, 108 (D.D.C. 2009), IHS argues that the arbitrary and capricious standard applies to this claim. Def.'s Mem. 16-17. In *Citizen Potawatomi*, the court found that the APA standard applied, noting that both the Supreme Court and the Court of Appeals for this Circuit have found that there is a "strong presumption" that agency action is governed by the APA standard "when a statute provides for review but does not specify any standard for that review." *Citizen Potawatomi*, 624 F. Supp. 2d at 108-09 (citing *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 715 (1963), *Al–Fayed v. CIA,* 254 F.3d 300, 304 (D.C. Cir. 2001)).

Maniilaq argues that *Citizen Potawatomi* is distinguishable because the plaintiffs in that case brought claims under the APA as well as the ISDEAA. Pl.'s Reply 3. Another case in this district

drew the same distinction. *See Seneca Nation of Indians v. HHS*, 945 F. Supp. 2d 135, 141 n.5 (D.D.C. 2013) (finding that *Citizen Potawatomi* was distinguishable because the plaintiff "brings claims under only the ISDEAA, as opposed to both the ISDEAA and APA as in *Citizen Potawatomi Nation*"). However, the *Seneca Nation* court did not explicitly find that *de novo* review always applied to ISDEAA cases, because in that case, the parties agreed that *de novo* review applied. *Id.* at 141.

Fortunately, the Court need not reach the issue. As discussed more fully below, this case turns on the resolution of several legal questions: (1) whether the defendant correctly interprets 42 C.F.R. § 137.132, the regulation setting the procedural requirements for submitting a final offer; (2) whether under the ISDEAA, a lease may be included in a FA; and (3) whether the agency is entitled to remand if it fails to respond to a final offer within the statutory time period. Questions of law are reviewed *de novo* under the APA as in ordinary cases. *See Citizen Potawatomi*, 624 F. Supp. 2d at 114 ("It is well established that *de novo* review is the appropriate standard for such questions of law."); *Nebraska HHS v. United States HHS*, 340 F. Supp. 2d 1, 12 (D.D.C. 2004) (questions of law reviewed *de novo* under the APA).

## III.     ANALYSIS

### A. Funding Agreements and the Final Offer Process under the ISDEAA

Congress enacted the ISDEAA in 1975. *See* Indian Self-Determination and Education Assistance Act of 1975, Pub. L. No. 93-638, 88 Stat. 2203. The ISDEAA authorizes Indian tribes and tribal organizations to assume responsibility for the administration of health related PFSAs that HHS, through IHS, would otherwise be obligated to provide. 25 U.S.C. § 450f(a)(1). Indian tribes assume responsibility for these functions by entering into "compacts" with IHS. *See* 25 U.S.C.

§§ 450*l*(a) and (c); *id*. at § 458aaa-3(a). These compacts are accompanied by a separate FA identifying the PFSAs the tribe will provide and the funding the tribe will receive from IHS for those PFSAs. *Id*. at § 458aaa-4.

The ISDEAA anticipates that there will be instances where IHS and the tribe cannot agree on the terms of a FA and sets out a procedure to resolve these disputes. The statute instructs that if "the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian tribe may submit a final offer to the Secretary." 25 U.S.C. § 458aaa-6(b). Within "45 days after such submission, or within a longer time agreed upon by the Indian tribe," the Secretary "shall review and make a determination with respect to such offer." *Id*. Section 458aaa-6(c)(1)(A) lists four grounds IHS may use to justify the rejection of a final offer.[5] If the IHS fails to timely respond to the offer, the consequences are severe: "In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c), *the offer shall be deemed agreed to by the Secretary*." 25 U.S.C. § 458aaa-6(b) (emphasis added).

---

[5] Those grounds are:
> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this part;
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
> (iv) the Indian tribe is not eligible to participate in self-governance under section [ ] [458aaa-2]. . . .

25 U.S.C. § 458aaa-6(c)(1)(A)(i)-(iv).

IHS's regulations confirm that a "final offer" becomes part of the tribe's FA if the agency fails to respond. The title of 42 C.F.R. § 137.136 poses the following question: "What happens if the agency takes no action within the 45 day review period (or any extensions thereof)?" The answer is simple: "The final offer is accepted automatically by operation of law." 42 C.F.R. § 137.136. The next section makes it clear that this rule is absolute, stating that "there are no exceptions to this rule if the 45 day review period or extension thereto, has expired, and the Tribe's offer is deemed accepted by operation of law." 42 C.F.R. § 137.137. The regulations go on to address the consequences of acceptance or deemed acceptance. Section 137.138 states that "[a]fter the Indian Tribe's final offer is accepted or deemed accepted, the terms of the Indian Tribe's final offer and any funds included therein, shall be added to the funding agreement or compact within 10 days of the acceptance or the deemed acceptance." 42 C.F.R. § 137.138.

### B. The Effect of Maniilaq's November 28, 2012 Letter

The defendant acknowledges that it did not respond to the plaintiff's November 28, 2012 letter within 45 days. *See* Def.'s Statement of Material Facts ¶ 8 [ECF No. 21]. IHS nevertheless argues that the proposed lease is not part of the FA because (1) Maniilaq did not follow the procedural requirements for submitting a final offer; and (2) a lease is not an appropriate provision of a FA. *See* Def.'s Mem. [ECF No. 21]. Neither argument is convincing.

#### 1. Whether Maniilaq's purported "final offer" satisfied formal requirements codified in IHS's regulations

A regulation implementing the final offer provisions entitled "How does the Indian Tribe submit a final offer?" specifies the technical requirements for submitting final offer:

(a) A written final offer should be submitted:
    (1) During negotiations to the agency lead negotiator or
    (2) Thereafter to the Director.

(b) The document should be separate from the compact, funding agreement, or amendment and clearly identified as a "Final Offer."

42 C.F.R. § 137.132. IHS argues that the November 28 letter fails to satisfy the requirements that a final offer be "separate from the . . . amendment" and "clearly identified as a 'Final Offer,'" Def.'s Mem. 21-23, an argument that largely depends on the Court's acceptance of IHS's definition of those terms as they are used in the regulation.[6]

Under the defendant's reading, a final offer is not "separate" from the amendment if the amendment is sent with the final offer. *See* Def.'s Reply 5 ("The Plaintiff concedes that it attached the proposed amendment, the proposed lease at issue, to the [November 28 letter.]"). But IHS's interpretation of "separate" to mean "far away from" does not make logical sense. As the plaintiff succinctly explains, the requirement that a final offer be made in a separate document from the amendment "prohibits contractors from submitting an amended compact or a funding agreement proposal without separately identifying or explaining any new proposed terms," in order to spare IHS "the burden of identifying the proposed changes" in the amendment or FA. Pl.'s Reply 9. Therefore, the better reading of the term "separate" in this context requires the final offer to be made in a distinct

---

[6] For the first time in its reply, IHS states that the Court should give deference to the agency's interpretation of its own regulations. Def.'s Reply 5. Leaving aside the question of whether deference would be appropriate in this type of case, *see Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001), the IHS's reasoning does not accurately reflect the law. IHS states that "IHS's interpretation of its own regulation should be given deference because (a) the regulation is not ambiguous and (b) the agency's interpretation is not plainly erroneous or inconsistent [with the regulation]." Def.'s Reply 5. The Supreme Court has made it clear that deference to an agency's interpretation of its own regulation is only appropriate when, as a threshold matter, the regulation *is* ambiguous. *See, e.g., Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (deference to an agency's interpretation of regulations "is warranted only when the language of the regulation is ambiguous"). However, IHS asserts that it should get deference *because* 42 C.F.R. § 137.132 is *not* ambiguous. Def.'s Reply 5. Therefore, the Court will give no special deference to IHS's interpretation of 42 C.F.R. § 137.132.

document from the amendment itself, but does not prohibit sending the amendment along with the final offer letter, as Maniilaq has done.[7]

IHS also argues that the November 2012 letter was not sufficiently "clearly identified" to satisfy 42 C.F.R. § 137.132(b). Def.'s Mem. 22. Both parties agree that the purpose of the requirement that a "final offer" be "clearly identified" as such is to put IHS on notice that the 45 day statutory clock is ticking. *See* Pl.'s Mem. of P. & A. 9; Def.'s Mem. 20. IHS argues that in this case, "IHS was not put on notice that Plaintiff's November 2012 letter was intended as a final offer." Def.'s Mem. 22. According to IHS, 42 C.F.R. § 137.132 "requires that the whole document be clearly identified as a final offer." Def.'s Reply 6. The defendant observes that "[n]oticeably absent from the subject line of the [November 28] letter on the first page is any indication that this letter constitutes a final offer." Def.'s Mem. 22. IHS complains that in Maniilaq's "lengthy four page letter," the plaintiff "used the term final offer for the first and only time" on the third page, arguing that "[t]his type of obfuscation is precisely contrary to the requirement and need that a final offer be 'clearly' identified." *Id.* As a result IHS maintains that because "IHS was not put on notice that the Plaintiff's November 2012 letter was intended as a final offer, IHS was under no requirement to respond within 45 days." *Id.*

---

[7] IHS's interpretation of the word "separate" may be a result of misreading the regulation. In its initial brief, the defendant misquotes the regulation when it represents that 42 C.F.R. § 137.132 provides that all final offers must "be in a document that is *completely* separate from a compact . . . ." Def.'s Mot. 21 (emphasis added). The word "completely" is not in the regulation. *See* 42 C.F.R. § 137.132(b) ("The document should be separate from the compact . . . ."). This mistake is repeated in the defendant's reply, *see* Def.'s Reply 4, despite the fact that Maniilaq pointed out IHS's error in its reply brief, *see* Pl.'s Reply 9.

Maniilaq responds that IHS is attempting to "stretch" the requirement that an offer be clearly identified "well beyond its clear and reasonable meaning." Pl.'s Reply 10. The regulations do not specify a manner or place of identification. *Id.* It is true that the citation is not on the first page or on the subject heading of the letter, but Maniilaq's intentions are still clear. Maniilaq's letter explicitly states that the letter was intended as a final offer and cites the relevant statutory provision. Pl.'s Mem. of P. & A. Ex. E 3 (noting that the proposed lease is "submitted in accordance with the final offer provisions of Section 507 of the ISDEAA, 25 U.S.C. § 458aaa-6"). Maniilaq closed the letter by stating that it "would be happy to discuss these costs and the other terms of the lease with IHS *over the next 45 days.*" *Id.* at 4 (emphasis added). Including that specific time limit should have alerted IHS that the statutory clock was ticking. In addition, the letter contains "a description of the disagreement between [IHS] and [Maniilaq] and [Maniilaq's] final proposal to resolve the disagreement." *See* 42 C.F.R. § 137.133. IHS regulations require this type of description to be included in a final offer, so Maniilaq's inclusion would be another indication of the letter's intention. *See* Pl.'s Reply 10 n.5. IHS should have expected a final offer to be forthcoming given that the November 2012 letter was sent following several months of negotiations regarding Maniilaq's FA and the inclusion of the lease in particular. *See* Pl.'s Reply 12-13; Pl.'s Mem. of P. & A. Ex. C. As the plaintiff points out, an impasse in negotiations of this type is "precisely the circumstance in which a final offer is designed to be, and commonly is, invoked by tribal contractors." Pl.'s Reply 13.

The Court finds that the letter was identified with sufficient clarity to put IHS on notice that the letter was intended as a final offer, and that IHS was in fact on notice of Maniilaq's intentions. It is true that Maniilaq could have done more to make its intentions clearer. But the Court is not willing

to add requirements to the final offer process that are not specified in the regulations. *See Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (noting that statutes dealing with tribal rights should be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit"). The content of the letter and the context in which it was sent make it sufficiently clear that Maniilaq intended that the letter be a final offer. As Maniilaq notes, "IHS cannot now credibly claim to have been taken by surprise." Pl.'s Reply 13.[8]

### 2. **Whether the type of lease Maniilaq proposed may be included in a FA**

IHS maintains that even if the offer was properly submitted, the proposed lease is nevertheless not integrated into Maniilaq's FA because the ISDEAA only allows documents describing PFSAs to be incorporated into a FA. Def.'s Mem. 24-29 (citing 25 U.S.C. § 458aaa-4(d)). Section 458aaa-4(d) lists the terms that must be included in each FA. For each PFSA, the FA must also describe "the funds to be provided, including those funds to be provided on a recurring basis," 25 U.S.C. § 458aaa-4(d)(2)(B); "the responsibilities of the Secretary," *id.* at § 458aaa-4(d)(2)(D); and "any other provision with respect to which the Indian tribe and the Secretary agree," *id.* at § 458aaa-4(d)(2)(E).

IHS argues a lease is not a PFSA, and therefore IHS lacks statutory authority to include it in Maniilaq's FA and was not obligated to respond under the "final offer" provisions of 25 U.S.C. § 458aaa-6(b). Def.'s Mem. 27-29. According to IHS, "[i]n common ordinary language, none of the terms, programs, services, functions, and activities, are property contracts." Def.'s Mem. 26. IHS acknowledges § 458aaa-4(d)(2)(E) specifically allows "any other provision with respect to which the Indian tribe and the Secretary agree," to be included in the FA. *Id.* at 25. However, IHS contends

---

[8] During oral argument, the plaintiff stated that Maniilaq called IHS several times to inquire about the status of the letter but received no response, an assertion IHS did not deny.

that the term "provision" is defined as a "clause in a statute, contract, or other legal instrument," *id.* at 27 (quoting *Black's Law Dictionary* 1240 (7th ed. 1999)), while a lease is "commonly referred to as a whole contract," *id.* Therefore, the argument goes, a lease cannot be a "provision."

Maniilaq counters that IHS's interpretation of 25 U.S.C. § 458aaa-4 is overly narrow. Pl.'s Reply 14. As the plaintiff points out, provisions that cannot be strictly defined as PFSAs have been included in Maniilaq's prior FAs. *Id.* at 15. For example, Maniilaq's 2008 FA included provisions authorizing Maniilaq to utilize certain federal property and setting out reporting and maintenance requirements for that property. *Id.* at 16; *see* Pl.'s Mem. of P. & A. Ex. K, FY 2008 FA between Maniilaq and Association and HHS §§ 17-18 [ECF No. 17-13]. Maniilaq acknowledges that it is not aware of a § 450j(*l*) lease being included in any previous FA but maintains that a "lease itself is not meaningfully distinguishable from other types of documents that are routinely attached to and incorporated into an FA, though such documents, like leases, are not explicitly listed in the statute." Pl.'s Reply 15. Maniilaq argues that IHS's position is "illogical and unconvincing in light of the Agency's previous agreements to include the VBC Lease/Construction program in various forms in the parties' past FAs." *Id.*

Maniilaq persuasively argues that incorporation of the lease into the FA "is simply another way for Maniilaq to receive funding to carry out the VBC Lease/Construction Program." Pl.'s Reply 15. Put another way, the "program" for the purpose of 25 U.S.C. § 458aaa-4(d)(1) is the VBC Lease/Construction program. The proposed lease describes "the funds to be provided," 25 U.S.C. § 458aaa-4(d)(2)(B), and "the responsibilities of the Secretary," *id.* at § 458aaa-4(d)(2)(D), with respect to the VBC Lease/Construction Program.

Maniilaq's reading of 25 U.S.C. § 458aaa-4(d) is more persuasive, particularly when viewed in light of other provisions of the ISDEAA. *See Maracich v. Spears,* 133 S. Ct. 2191, 2203 (2013) ("It is necessary and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.") (citing *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455 (1993)). The ISDEAA requires that tribes "determine[]" the way in which PFSAs are planned, administered, and consolidated. 25 U.S.C. § 458aaa-4(b)(1). The ISDEAA also gives tribes some flexibility in determining how PFSAs are to be funded. A FA under the ISDEAA "authorize[s] the Indian tribe to . . . receive full tribal share funding, including tribal shares of discretionary Indian Health Service competitive grants (excluding congressionally earmarked competitive grants) for all programs, services, functions, and activities (or portions thereof) . . . ." 25 U.S.C. § 458aaa-4(b)(1). The use of the statutory term "including" indicates that funding for PFSAs may come from a number of sources.[9] *See Puerto Rico Mar. Shipping Auth. v. ICC,* 645 F.2d 1102, 1112 n.27 (D.C. Cir. 1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list of carriers that follows is illustrative, not exclusive.").

IHS asserts that the legislative history of the ISDEAA shows that the omission of leases from the enumerated list of programs, services, functions, and activities was not accidental, because "Congress purposefully decided that a lease would neither constitute a PFSA nor be a part of a

---

[9] The defendant argues that "[t]he fact that Congress deliberately left out the authority to include leases in an FA when it carved out a special exemption for grants [in § 458aaa-4(b)(1)] demonstrates that leases were never meant to be a term or provision of an FA." Def.'s Mem. 28-29. This assertion misconstrues the statute. Grants are not "carved out" as a special exemption. Instead, the statute lists "grants" as one possible source of funding, and nothing in the statute indicates any specific intention to leave out leases.

funding agreement." Def.'s Reply 8. The defendant notes that the mandatory leasing provision in 25 U.S.C. § 450j(*l*) was enacted in 1994, following a ban on IHS entering into new leases between 1971 and 1992. Def.'s Mem. 25. The defendant argues that the historical restrictions on leases evidence "Congress's intent to carefully control IHS's lease authority," *id.*, and therefore, "the omission of 'lease' in the statutory definition of what constitutes an FA under ISDEAA was not a mistake," *id.*

IHS's argument from legislative history is unconvincing. IHS asks this Court to view 25 U.S.C. § 458aaa-4 in light of the "scrutiny that Congress placed on IHS's granting of leases when the ISDEAA was enacted" in 1975. Def.'s Mem. 24. But the provisions dealing with FAs were enacted in 2000, nine years after the ban on leases had ended. *See* Tribal Self-Governance Amendments of 2000, Pub. L. No. 106-260, § 4, 114 Stat. 712 (2000) (enacting, *inter alia*, 25 U.S.C. § 458aaa-4). In 1994, between the original enactment of the ISDEAA and the enactment of the provisions relating to FAs, Congress amended the ISDEAA to *require* IHS to enter into a lease at the request of a tribe. *See* Indian Self-Determination Act Amendments of 1994, Pub. L. No. 103-413, § 102(10), 108 Stat. 4253 (1994) (enacting, *inter alia*, 25 U.S.C. § 450j(*l*)(1)). The parties do not dispute that under 25 U.S.C. § 450j(*l*)(1), IHS is required to enter into a lease for the Ambler Clinic (though they do dispute the amount Maniilaq should be compensated). *See* Def.'s Mem. 30. But IHS nevertheless maintains that it does not have the statutory authority to include the mandatory lease in a FA. This argument does not comport with the legislative encouragement of leases (which are mandatory under § 450j(*l*)(1)) and FAs (which are deemed accepted as a matter of law if not timely rejected). The defendant has not demonstrated any reason why this Court should infer that Congress

specifically "mean[t] to 'curtail' IHS's leasing authority," Def.'s Reply 8, by disallowing mandatory leases under § 450j(*l*)(1) to be included in a tribe's FA.

### 3. <u>Whether the defendant is entitled to remand for another chance to reject the plaintiff's final offer</u>

IHS argues that if this Court finds that the November 28 letter was a final offer, this Court should remand back to IHS "so that the agency can analyze Plaintiff's final proposal against the appropriate statutory criteria," because IHS mistakenly believed that it did not have to respond to the plaintiff's letter as a final offer. Def.'s Mem. 29-30. The defendant's request for another opportunity to consider Maniilaq's final offer is contrary to Congress's clear intention that IHS is bound by amendments to FAs that it did not reject within 45 days. *See* 25 U.S.C. § 458aaa-6(b) ("In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c) of this section, the *offer shall be deemed agreed* to by the Secretary.") (emphasis added). IHS's own regulations confirm that "if the agency takes no action within the 45 day review period," the final offer is "accepted automatically." 42 C.F.R. § 137.136. There is no room in the unambiguous language for the Court to give an agency another chance to review a final offer after the statutory period has lapsed. *See* 42 C.F.R. § 137.137 ("[T]here are no exceptions to this rule [that] if the 45 day review period or extension thereto, has expired, and the Tribe's offer is deemed accepted by operation of law."). The statute therefore requires the Court to find that, as a matter of law, the proposed lease is incorporated into the plaintiff's FA.

Case law from this District confirms that remand is not appropriate. In *Seneca Nation of Indians v. HHS*, Judge Collyer found that a tribe's proposal under another section of the ISDEAA was deemed accepted when IHS did not respond to a proposal within the statutory time limit, and

ordered that the proposed amendments became part of the tribe's contract without first remanding to the agency. 945 F. Supp. 2d 135, 147-48, 152. The statute triggering automatic acceptance in *Seneca Nation*, 25 U.S.C. § 450f(a)(2), states that when a tribe submits a proposed self-determination contract under the ISDEAA or an amendment to an existing contract, "the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant" that one of five statutory reasons for rejection applies. 25 U.S.C. § 450f(a)(2). The defendant in *Seneca Nation* also took the position that the statutory time period was not triggered because the tribe's submission was not covered by the relevant statute. *Seneca Nation*, 945 F. Supp. 2d at 147. But the court found that if HHS wished to take that position, the agency "should have done so within the statutorily provided 90 days." *Id.* at 149. The same principle applies here—if IHS wanted to take the position that a lease did not belong in a FA, it should have done so within the statutory time period.[10]

The defendant expressed concerns that if the lease is incorporated into the plaintiff's FA, the plaintiff will "dictate" the terms and cost of the lease. In *Seneca Nation,* Judge Collyer noted that automatic acceptance of contracts reflected Congress's intent:

> While this system may seem imbalanced, Congress designed self-determination contracts to work in this manner for a specific remedial purpose, and the ISDEAA, its regulations, and the resulting contracts between Indian tribes and the United States must be read with that remedial intent in mind. By ignoring her deadline, the Secretary became bound to the proposed Contract amendments.

_____

[10] In a previous negotiation, IHS timely rejected a final offer from Maniilaq proposing the incorporation of another lease into Maniilaq's 2010 Funding Agreement. *See* Pl.'s Mem. of P. & A. Ex. I, Nov. 19, 2009 Letter from IHS Director to President of Maniilaq Assoc. 2 [ECF No. 17-11]. In that instance, the IHS rejected the proposal on the grounds that "the amount of funds proposed in the final offer exceeds the applicable funding levels" for the PFSAs Maniilaq was to perform. *Id.* at 3 (quoting 25 U.S.C. § 458aaa-6(c)(1)(A)(i)).

*Seneca Nation*, 945 F. Supp. 2d at 152. If IHS had taken the opportunity to reject the offer or negotiate with the plaintiff during the forty-five day time period, the terms would not be "dictated" by the plaintiff. Section 458aaa-6(b) is perfectly clear and specifically spells out the consequences of inaction within the statutory time period: "[T]he offer shall be deemed agreed to by the Secretary." 25 U.S.C. § 458aaa-6(b). If the offer has already been "deemed agreed to," this Court cannot see how remand would be consistent with the statute.[11]

### C.  Maniilaq's recovery cannot include funds already associated with the Ambler Clinic already paid under the previous FA

Maniilaq's final offer, which is now incorporated into its 2013 FA, proposed that IHS lease the Ambler Clinic for $172,536. Pl.'s Mem. of P. & A. Ex. E 4 [ECF No. 17-7]. IHS argues that in the event that this Court finds that the proposed § 450j(*l*) lease does become part of Maniilaq's 2013 FA, Maniilaq should not receive both the income from the § 450j(*l*) lease on the Ambler Clinic and the funds IHS was previously paying Maniilaq pursuant to the VBC program under Maniilaq's former FA. Def.'s Mem. 40-41. Maniilaq agrees that it is not entitled to both VBC funding and proceeds of the § 450j(*l*) lease. Pl.'s Reply 25. IHS informed Maniilaq that the 2013 FA included $29,932.12 for the Ambler Clinic. Pl.'s Mem. of P. & A. Ex. F 1. Maniilaq represents that it is prepared to apply this amount as an offset to lease payments owed by IHS "if IHS can demonstrate

---

[11] To support its argument that remand is the proper remedy, the defendant heavily relies upon *Aleutian Pribilof Islands Association v. DOI*, 537 F. Supp. 2d 1 (D.D.C. 2008). Def.'s Mem. 29. In *Aleutian Pribilof*, the court found the agency had not followed proper procedures when it rejected a tribal contractor's request for funds under section 14(h)(1) of the Alaska Natives Claim Settlement Act. *Aleutian Pribilof*, 537 F. Supp. 2d at 12-13. The court remanded so that the agency could apply the appropriate statutes and regulations to the contractor's proposal. *Id*. However, the *Aleutian Pribilof* plaintiffs brought their claims both under the ISDEAA and the APA. *Id*. at 6. The court specifically declined to address the plaintiffs ISDEAA claims, addressing only the proper remedy under the APA. *Id*. 6-7.

that this is the correct amount associated with the Ambler share. . . ." Pl.'s Reply 25. The Court agrees with the parties that Maniilaq's recovery is offset by the amount already paid associated with the Ambler Clinic.

## IV.    CONCLUSION

The defendant states, and the Court agrees, that "[d]etermining that a final offer is 'deemed approved' is a harsh penalty. . . ." Def.'s Mem. 23. But that is the choice that Congress has made. Ultimately, the defendant can give this Court no reason why it should ignore the clear language of the statute. Therefore, the Court finds that the proposed lease of the Ambler Clinic is included in Maniilaq's 2013 FA by operation of law.

November 3, 2014

Thomas F. Hogan
Senior United States District Judge